231 F.3d 1172 (9th Cir. 2000)
 DESERT CITIZENS AGAINST POLLUTION; SIERRA CLUB; DESERT PROTECTIVE COUNCIL, Plaintiffs-Appellants,
v.
HENRI R. BISSON; TERRY A. REED; MICHAEL DOMBECK; BUREAU OF LAND MANAGEMENT, Defendants-Appellees,
and
GOLD FIELDS MINING CORPORATION; ARID OPERATIONS INCORPORATED, Intervenors-Defendants-Appellees.
 No. 97-55429
 U.S. Court of Appeals for the Ninth Circuit
 Argued and Submitted June 4, 1998
Filed November 6, 2000
 
 [Copyrighted Material Omitted]
 William S. Curtiss, Earthjustice Legal Defense Fund, San Francisco, California, for the appellants.
 Ellen J. Durkee, Attorney, Environment & Natural Resources Division, Department of Justice, Washington, D.C., for the appellees.
 Charles L. Kaiser, Davis, Graham & Stubbs, Denver, Colorado, for the intervenors.
 Appeal from the United States District Court for the Southern District of California;Rudi M. Brewster, District Judge, Presiding D.C. No. CV-96-02011-RMB/ JFSS
 Before: Procter Hug, Jr., Chief Judge, Robert Boochever and Alex Kozinski, Circuit Judges.
 HUG, Chief Judge:
 
 
 1
 We review the district court's rulings on an action brought by three environmental organizations under the Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C.S 1701 et. seq. Desert Citizens Against Pollution, Sierra Club, and Desert Protective Council (collectively, "Desert Citizens") challenge a decision by the Bureau of Land Management ("BLM") to enter into a land exchange with intervenors Gold Fields Mining Corporation and its subsidiary, Arid Operations, Inc. ("Gold Fields"). The companies plan to construct a landfill on the federal lands in Imperial County, California which are subject to the exchange ("selected lands"). Desert Citizens alleges that by relying on an outdated appraisal that undervalued the federal lands, BLM failed to comply with Section 206(b) of FLPMA, which requires that the lands involved in an exchange be of equal market value or that the exchange be made equal through cash payment. 43 U.S.C. S 1716(b).[1] The district court dismissed the action on the ground that Desert Citizens lacked standing, and in the alternative, denied Desert Citizens' motion for a preliminary injunction. We have jurisdiction under 28 U.S.C.S 1291 and S 1292(a)(1), and we reverse the judgment of the district court.
 
 I.
 Factual Background
 
 2
 The land exchange at issue in this case involves BLM's transfer of approximately 1,745 acres of federal land in Imperial County appraised at $610,914 to Gold Fields. Gold Fields plans to use this land in conjunction with the proposed Mesquite Regional Landfill. In return, BLM acquired from Gold Fields 2,642 acres with an appraised value of $609,995 and $919 in cash. The private property transferred to the government includes land in the Santa Rosa Mountains Wilderness and National Scenic Areas in Riverside County, and the Little Chuckwalla Mountains Wilderness Area in Imperial County ("offered lands").
 
 
 3
 BLM's Record of Decision ("ROD") approving the exchange relied on a June 1994 appraisal conducted by the private firm of Nichols & Gaston. Nichols & Gaston determined the highest and best use for the selected lands to be "open space" or "mine support," which involves the storage of overburden and waste from mining operations. The determination of highest and best use was based primarily on the fact that the selected lands were located in proximity to the Mesquite Mine, owned by Gold Fields.
 
 
 4
 On April 27, 1992, two years before Nichols & Gaston appraised the land for mine support purposes, Gold Fields' subsidiary submitted an application to Imperial County to construct the Mesquite Regional Landfill on lands that included the 1,745 acres of federal land. Gold Fields concurrently proposed acquiring the 1,745 acres by the land exchange with BLM that is the subject of this suit. According to the Environmental Impact Statement ("EIS") for the landfill project, the Mesquite Mine is expected to go out of business on or before 2008.
 
 
 5
 Desert Citizens initially pursued administrative remedies. Upon dismissal of the action by BLM's State Director, the environmental groups jointly appealed to the Interior Board of Land Appeals ("IBLA") and petitioned for a stay pending appeal. IBLA rejected the consolidated appeals and the request for the stay. Desert Citizens brought the instant case under the Administrative Procedure Act ("APA"), 5 U.S.C. S 551 et. seq., in November 1996, alleging that group members used and enjoyed the federal lands selected for exchange. The complaint also alleged that the land exchange was arbitrary, capricious and an abuse of BLM's discretion and exceeded the statutory limitations on BLM's authority to exchange public lands under FLPMA. Desert Citizens requested, among other relief, that the ROD approving the exchange be declared unlawful and set aside by the district court. In addition, the complaint requested preliminary injunctive relief prohibiting BLM and Gold Fields from taking any further steps to complete the exchange based on the ROD.
 
 
 6
 The district court dismissed the action on the ground that Desert Citizens lacked standing, and in the alternative, denied the motion for a preliminary injunction. The day after the district court entered judgment, BLM and the private parties consummated the land exchange. The selected lands have now been conveyed to Gold Fields and the offered lands have been conveyed to the United States.
 
 II.
 Standard of Review
 
 7
 The district court's dismissal based on standing is reviewed de novo. Johns v. County of San Diego , 114 F.3d 874, 876 (9th Cir. 1997); Whitmore v. Federal Election Comm'n, 68 F.3d 1212, 1214 (9th Cir. 1995).
 
 
 8
 The order denying preliminary injunctive relief is reviewed to determine whether the district court abused its discretion or based its decision on an erroneous legal standard or clearly erroneous findings of fact. Miller ex. rel. NLRB v. California Pacific Med. Ctr., 19 F.3d 449, 455 (9th Cir. 1994) (en banc); Stanley v. University of Southern California, 13 F.3d 1313, 1319 (9th Cir. 1994).
 
 III.
 Standing
 
 9
 The district court determined that Desert Citizens' alleged injury failed to meet the requirements for standing because the complaint alleged an environmental injury without challenging the government's compliance with an environmental statute. The court also reasoned that Desert Citizens' allegation of BLM's noncompliance with FLPMA's equal-value provisions only constituted an attack on the way federal money is spent, making Desert Citizens' injury indistinguishable from that of other taxpayers and therefore insufficiently particularized to confer standing. The court further determined that there was no causal connection between the injury alleged and the purported under-valuation.
 
 
 10
 Desert Citizens alleges that its members currently use and enjoy the federal lands at the proposed landfill site for recreational, aesthetic, and scientific purposes. Desert Citizens contends that the land exchange will prevent them from using and enjoying these lands, which are the subject of the transfer to Gold Fields.[2]
 
 
 11
 The Supreme Court enumerated the requirements for Article III standing in Lujan v. Defenders of Wildlife, 504 U.S. 555 (1992):
 
 
 12
 First, the plaintiff must have suffered an injury in fact -an invasion of a legally-protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of -the injury must be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.
 
 
 13
 Id. at 560-61 (internal citations and quotations omitted).
 
 A. Injury in Fact
 
 14
 Desert Citizens has suffered an injury in fact. The recreational or aesthetic enjoyment of federal lands is a legally protected interest whose impairment constitutes an actual, particularized harm sufficient to create an injury in fact for purposes of standing. See Sierra Club v. Morton , 405 U.S. 727, 734 (1972). Desert Citizens met the formal requirements of Sierra Club by alleging that its members make use of the federal lands that are the subject of the transfer to Gold Fields. See id. at 735.[3] We have held repeatedly that environmental and aesthetic injuries constitute injuries in fact for standing purposes. See, e.g., Mount Graham Red Squirrel v. Espy, 986 F.2d 1568, 1581-82 (9th Cir. 1993) (extinction of species whose observation in the wild provided plaintiffs scientific, recreational and aesthetic enjoyment conferred requisite injury for standing purposes); Fund for Animals, Inc. v. Lujan, 962 F.2d 1391, 1396 (9th Cir. 1992) (diminished opportunity for Fund members to view the northern bison herd in Yellowstone established standing to challenge the National Park Service's 1990 bison management plan); Alaska Fish & Wildlife Fed'n and Outdoor Council, Inc. v. Dunkle, 829 F.2d 933, 937 (9th Cir. 1987) (decrease in number of migratory birds resulting from a permissive hunting policy injured "those who wish to hunt, photograph, observe, or carry out scientific studies on the migratory birds").
 
 
 15
 The district court constructed a novel rule by stating that injuries of an environmental or aesthetic nature can be shown only where plaintiffs allege noncompliance with an environmental statute or regulation. Applying this type of categorical rule runs counter to precedent recognizing that standing "is a highly case-specific endeavor, turning on the precise allegations of the parties seeking relief." National Wildlife Fed'n v. Hodel, 839 F.2d 694, 703-04 (D.C. Cir. 1988). Nothing in our jurisprudence requires citation of a so-called "environmental" statute as a prerequisite to standing. Standing is based upon the nature of the injury alleged and whether a favorable decision would redress the injury. Finally, the court provided no basis for its determination that FLPMA, which governs vast tracts of public land, is not an environmental statute. FLPMA's declaration of policy ranks natural resource preservation among its principal goals.[4]
 
 
 16
 The district court also erred in analogizing the present challenge to a general attack on the way federal money is spent.[5] The district court cited Northern Plains Resource Council v. Lujan, 874 F.2d 661 (9th Cir. 1989), in which we concluded that environmental plaintiffs did not have standing to challenge an exchange between the Interior Department and a coal mining company for purposes of consolidating coal lease tracts. But Northern Plains denied standing because the environmental groups alleged only general injury to their status as taxpayers and not environmental injury such as alleged here. See id. at 668; see also National Wildlife Fed'n v. Burford, 871 F.2d 849, 852-53 (9th Cir. 1989) ("touchstone " of environmental group's standing is assertion of injuries from loss of use and enjoyment in land if coal lease sale goes forward without full compliance with law).
 
 
 17
 The present challenge to FLPMA's equal-value requirement is not merely a generalized allegation of federal revenue loss at taxpayers' expense. Rather, it is an effort by land users to ensure appropriate federal guardianship of the public lands which they frequent. If, by exchange, public lands are lost to those who use and enjoy the land, they are certainly entitled under the APA to file suit to assure that no exchange takes place unless the governing federal statutes and regulations are followed, including the requirement that the land exchanged is properly valued by the agency.
 
 
 18
 Our decision in National Forest Preservation Group v. Butz, 485 F.2d 408 (9th Cir. 1973) supports this view. In Butz, we granted standing to an environmental group challenging a pre-FLPMA land exchange, noting that "[t]he plaintiffs have brought themselves within Sierra Club v. Morton by alleging that they are recreational users of the lands in question." Id. at 410. Among other allegations, the appellants in Butz alleged that the Forest Service had failed to comply with the equal-value requirements of the General Exchange Act of 1922, 16 U.S.C. SS 485-86, and the more rigorous equal-value requirements of the so-called "1926 Act," which extended the boundaries of Yellowstone National Park. 16 U.S.C.SS 3839. Although we ultimately determined that the Secretary's reliance on the relevant appraisals was supported by substantial evidence, we reversed the district court's summary judgment and remanded for an evidentiary hearing on the question whether the equal-value requirements were satisfied. See id. at 413-14.
 
 B. Redressability
 
 19
 In determining that there was no causal connection between Desert Citizens' stated injury and BLM's alleged under-valuation, the district court quoted Gold Fields' argument that "any loss in Plaintiffs' enjoyment of those lands would be precisely the same whether they were valued at $1 or $1 million." The court apparently believed that a proper valuation would result in only two possible remedies: 1) Gold Fields would offer additional private lands to make up for the shortage received by the government; or 2) Gold Fields would offer additional cash. Implicit is the assumption that even if Desert Citizens succeeded on the merits and BLM relied on a new appraisal, Desert Citizens' alleged injury -inability to use and enjoy the public lands at the proposed landfill site -would not be redressed because the public lands would nevertheless be traded away.
 
 
 20
 We are deciding standing at the pleading stage, and" `[f]or purposes of ruling on a motion to dismiss for want of standing, both the trial and reviewing courts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party.' " Graham v. Federal Emergency Management Agency, 149 F.3d 997, 1001 (9th Cir. 1998) (quoting Warth v. Seldin, 422 U.S. 490, 501 (1975)). We emphasize that it is significant that we are reviewing a motion to dismiss, and not a summary judgment on the issue of standing.
 
 
 21
 The district court placed an unreasonable burden on Desert Citizens. Under its approach, citizens challenging federal actions that violate FLPMA must show not only that a court's decision would invalidate a particular transaction but also that no subsequent exchange would take place. This is not correct. "[A] federal plaintiff must show only that a favorable decision is likely to redress his injury, not that a favorable decision will inevitably redress his injury . .. . [T]he mere fact that, on remand, [the government might not grant plaintiff's request] does not defeat plaintiff's standing." Beno v. Shalala, 30 F.3d 1057, 1065 (9th Cir. 1994) (citation omitted).
 
 
 22
 Desert Citizens requests in its complaint that the ROD approving the exchange be declared unlawful and set aside as contrary to the requirements of FLPMA.[6] In other words, Desert Citizens asked the district court to set aside an illegal exchange that would injure its members. If the court had found the appraisal flawed, and the BLM's valuation arbitrary and capricious, it would have granted the relief requested; the transfer based on the current appraisal would not have taken place and Desert Citizens' members could have continued to use and enjoy the selected federal lands. The relief Desert Citizens is seeking would thus redress their injury because the particular exchange would not go through.
 
 
 23
 An individual may enforce procedural rights "so long as the procedures in question are designed to protect some threatened concrete interest of his that is the ultimate basis of his standing." Lujan, 504 U.S. at 573 n.8. A plaintiff need not establish with absolute certainty that adherence to the required procedures would necessarily change the agency's ultimate decision. See Utah v. Babbitt, 137 F.3d 1193, 1216 n.37 (10th Cir. 1998). Whether Gold Fields and BLM would negotiate a new exchange after a proper appraisal and BLM valuation had been made, and what that new exchange would be, is sheer speculation at this stage of the proceedings. If the current exchange is not based on a proper valuation, it must be set aside. What the parties do after that is up to them, and is not before us.
 
 C. Prudential Standing
 
 24
 The BLM also argues that Desert Citizens has failed to satisfy the prudential standing rule which requires that a plaintiff's alleged injuries must fall within the "zone of interests" protected by the statute at issue. Citing Bennett v. Spear, 520 U.S. 154 (1997), where the Supreme Court analyzed the zone of interests "by reference to the particular provision of law upon which the plaintiff relie[d]," id. at 175-76, the BLM contends that Desert Citizens' alleged environmental injuries are not within the zone of interests which the equal value provisions of FLPMA Section 206(b) are intended to protect. The Supreme Court later established the following inquiry for determining whether the test has been satisfied:
 
 
 25
 The proper inquiry is simply whether the interest sought to be protected by the complainant is argu ably within the zone of interests to be protected . . . by the statute. Hence in applying the "zone of inter ests" test, we do not ask whether, in enacting the statutory provision at issue, Congress specifically intended to benefit the plaintiff. Instead, we first dis cern the interests "arguably . . . to be protected" by the statutory provision at issue; we then inquire whether the plaintiff's interests affected by the agency action are among them.
 
 
 26
 National Credit Union Admin. v. First Nat'l Bank & Trust Co., 522 U.S. 479, 492 (1998) (emphasis in original, internal citation omitted).
 
 
 27
 Desert Citizens falls within the zone of interests of FLPMA. As noted earlier, FLPMA requires that "the public lands be managed in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values." 43 U.S.C. S 1701(a)(8); see also note 4, supra. That policy encompasses Desert Citizens' interest in seeking to invalidate an allegedly unlawful transfer of federal land that will deprive its members of their aesthetic and recreational interest in the land. Failure to include Desert Citizens within the zone of interests also would undermine FLPMA's stated goal of providing "judicial review of public land adjudication decisions." 43 U.S.C. S 1701(a)(6).
 
 
 28
 BLM further argues that, even if Desert Citizens is within the zone of interests protected by the statutory provision, its standing is precluded by FLPMA Section 206(d), which provides parties to a land exchange with an option to settle valuation disputes through arbitration. In contending that Section 206(d) reflects a "fairly discernable congressional intent" to promote efficiency and preclude third party challenges to the equal value provisions, BLM improperly relies on Block v. Community Nutrition Inst., 467 U.S. 340 (1984) and Overton Power Dist. No. 5 v. O'Leary, 73 F.3d 253 (9th Cir. 1996). In Block, the statute in question specified judicial review for one class of persons, milk handlers, and made no provision for broader judicial review elsewhere in the Act. The statute in Overton Power required the Western Area Power Administration and its contractors to establish, by contract, procedures for reviewing "any dispute," and then listed, by name, the authorized contractors. 73 F.3d at 256.[7] FLPMA's purely optional arbitration provisions do not reveal a legislative intent to preclude broader citizen review, particularly in light of FLPMA's goal of providing judicial review.
 
 
 29
 Finally, BLM claims that, rather than challenging the equal value provisions, Desert Citizens could have challenged this land exchange under the National Environmental Policy Act ("NEPA"), 42 U.S.C. S 4332(2)(C), or FLPMA's "public interest" provision, 43 U.S.C. S 1716(a). However, BLM offers no evidence that either of these two options was intended as an exclusive avenue for judicial review. Furthermore, as the district court aptly acknowledged in outlining FLPMA's conditions, the public interest and the equal value requirements are separate requirements that must be met prior to approval of a land exchange. Satisfaction of one of these requirements is insufficient to excuse the other.[8]
 
 IV.
 Adequacy of the Appraisal
 
 30
 Because we conclude that Desert Citizens has standing, we now turn to the merits of this appeal. Pursuant to the APA, an agency decision will not be set aside unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. S 706(2)(A). The decision is entitled to substantial deference and must be upheld if it rests on a rational basis. See Hopi Tribe v. Navajo Tribe , 46 F.3d 908, 914 (9th Cir. 1995). A reviewing court may not substitute its judgment for that of the agency. See Marsh v. Oregon Natural Resources Council, 490 U.S. 360, 378 (1989). The agency, however, must articulate a rational connection between the facts found and conclusions made. See Oregon Natural Resources Council v. Lowe, 109 F.3d 521, 526 (9th Cir. 1997). This standard necessitates a judicial examination of the disputed decision's rationale and surrounding circumstances in order to carry out the "demand that courts ensure that agency decisions are founded on a reasoned evaluation `of the relevant factors.' " Marsh, 490 U.S. at 378.
 
 A. Highest and Best Use
 
 31
 The district court concluded that the BLM's reliance on the Nichols & Gaston appraisal, concluding that the highest and best use of the federal land was either open space or wildlife habitat, or mine support, at a value of $350 an acre, was proper as there was "no general market for use of the land as a landfill." The court's decision was based, in part, on its determination that the selected lands were surrounded by or adjacent to Gold Fields' property, and any other party wishing to construct a landfill would need to purchase at least a portion of Gold Fields' land. The court further reasoned that landfill development was a high-risk venture requiring substantial pre-development permitting and compliance with environmental regulations. Concluding that a landfill was not legally, physically, or financially feasible, the court determined that neither BLM nor the appraiser were under an obligation to consider and discredit "unmeritorious " uses. The court further determined that, whether or not Desert Citizens agreed with the appraisal's selection of highest and best use, BLM's decision to accept the appraisal rested on a rational basis and should not be disturbed.
 
 1. Legal and Regulatory Requirements
 
 32
 FLPMA's implementing regulations prevent the BLM from approving a land exchange until an appraisal is completed. The appraisal must determine the "market value " of the affected lands, based on the "highest and best use" of the appraised property, and estimate the market value "as if in private ownership and available for sale on the open market." 43 C.F.R. S 2201.3-2(a)(1)-(2).[9] The report documenting the appraisal must set forth supporting information, including a description of "all relevant physical, legal and economic factors" bearing on the comparable sales used. 43 C.F.R. S 2201.3-3(g).
 
 
 33
 Section 206(f)(2) of FLPMA requires the implementing regulations that govern appraisals to "reflect nationally recognized appraisal standards, including, to the extent appropriate, the Uniform Appraisal Standards for Federal Land Acquisitions ("UAS")." 43 U.S.C. S 1716(f)(2). BLM regulations in turn require determination of market value to conform, to the extent appropriate, with the UAS. See 43 C.F.R. S 2201.3. Before it can be concluded that any use for the property is its highest and best use, the UAS requires that the use must be "physically possible, legally permissible, financially feasible" and "result in the highest value." UAS at 73.[10] "Each of these four criteria must be addressed in the appraisal report." Id.
 
 
 34
 While uses that are merely speculative or conjectural need not be considered, uses that are "reasonably probable" must be analyzed as a necessary part of the highest and best use determination. UAS at 8-9. This analysis must "hav[e] due regard for the existing business or wants of the community, or such needs as may be reasonably expected to develop in the near future." 26 Am Jur. 2d Eminent Domain S 322 (1996).
 
 
 35
 2. Expected Use of the Selected Lands as a Regional Landfill
 
 
 36
 The district court erred in determining that BLM's reliance on the Nichols & Gaston appraisal was reasonable, given that evidence available prior to 1994 indicated that the selected lands were expected to be used for landfill purposes, and the existence of other landfill proposals in the region indicated a general market for landfill development. Because landfill use was reasonably probable, it must, at the very least, have been considered as part of the highest and best use determination. UAS at 8-9. The appraisal report failed to consider the market demand for this potential future use, or for any other reasonably probable uses for which the land may have been adapted. The BLM did not remedy these shortcomings in the ROD.
 
 
 37
 The appraisal report merely provides the following brief and conclusory paragraphs describing the choice of highest and best use for the selected lands:
 
 
 38
 Priority I lands are located within close proximity to the Mesquite Mine and would be a natural addition to the lands currently owned by Gold Fields. If these lands were not to be added to the current holdings of Gold Fields, these properties would probably remain as open space and wildlife habitat. Therefore, the subject lands designated as Priority I are considered to have a highest and best use for utilization in con junction with the current mining operation of Gold Fields Mesquite Mine.
 
 
 39
 The conclusory nature of the report's treatment of highest and best use fails to provide the level of detail required by the UAS, which states:
 
 
 40
 The appraiser's determination of highest and best use is one of the most important elements of the entire appraisal process. Therefore, the appraiser must apply his or her skill with great care and clearly justify the highest and best use conclusion in the appraisal report.
 
 
 41
 UAS at 72 (footnote omitted). The appraisal report also fails to meet the UAS requirement that supply, demand, and vicinity trends be considered:
 
 
 42
 Many things must be considered in determining the highest and best use of the property including: sup ply and demand; competitive properties; use confor mity; size of the land and possible economic type and size of structures or improvements which may be placed thereon; zoning; building restrictions; neighborhood or vicinity trends.
 
 
 43
 Id. at 10. The UAS mirrors well-settled law which requires the market evaluation to consider development trends in the area:
 
 
 44
 Some specific factors considered in the analysis of market value include market demand for the prop erty, the proximity of the property taken to property with comparable uses, the history of economic development in the area, the existence of specific plans for development of the taken parcel (including any concrete steps taken to effectuate that develop ment), the use to which the property was put at the time of the taking, and the use to which the property may be put in the future (for example, if the property were re-zoned), provided that such evidence is not too remote or speculative.
 
 
 45
 26 Am. Jur. 2d Eminent Domain S 300 (1996); see also United States v. Benning, 330 F.2d 527, 531 (9th Cir. 1964) ("The highest and best use is not found from the past history or present use of these lands but from reasonable future probability in the light of the history of the region in general . . . .").
 
 
 46
 The appraisal determines the highest and best use to be utilization in conjunction with Gold Fields' current mining operation. Yet, the appraiser well knew that Gold Fields and the BLM fully intended to utilize the land for the Mesquite Regional landfill, and had taken substantial steps to do so.
 
 
 47
 It is especially noteworthy that a section of the Nichols &
 
 
 48
 Gaston report titled "Property Description" fully acknowledged the likelihood of the future landfill, noting:"Currently, there are plans for the mine to become part of a major landfill facility that will serve primarily the Los Angeles basin." A footnote indicates that the information in that section was taken from the 1992 "Mesquite Mine Tour Fact Sheet." The fact that this information was included (perhaps inadvertently) in the appraisal report but was not addressed in the section dealing with highest and best use is particularly troubling. The Supreme Court has stated that "[t]he determination [of highest and best use] is to be made in the light of all facts affecting the market value that are shown by the evidence taken in connection with those of such general notoriety as not to require proof." Olson v. United States, 292 U.S. 246, 257 (1934). The fact that the appraisal report itself stated that a landfill was to be built indicates that the landfill proposal had achieved general notoriety at the time the report was written. At the very least, the appraisal should have considered this in determining its highest and best use.[11]
 
 
 49
 The BLM improperly relies on a condemnation case, United States v. Weyerhaeuser Co., 538 F.2d 1363, 1366 (9th Cir. 1976), to argue that the site's expected use as a landfill should not affect market value. Weyerhaeuser involved a condemnation action in which the court determined that the government need not pay for a demand created by the government itself: "[I]t is not fair that the government be required to pay the enhanced price which its demand alone has created." Id. at 1366, (quoting United States v. Cors, 337 U.S. 325, 333 (1949)).
 
 
 50
 However, Weyerhaeuser reflects a special rule applicable only to Government condemnation cases. The inquiry in a condemnation case is "just compensation" and not simply "market value."[12] The proposed Mesquite Regional Landfill is not a governmental project. Three private companies, Gold Fields Mining Corporation, Western Waste Industries, and Southern Pacific Environmental Systems, jointly engaged Arid Operations, Inc., to develop and operate the landfill on their behalf.[13] It is these private parties that will reap the benefit of the value of the property as a landfill.[14]
 
 
 51
 Gold Fields' proposed use of a parcel of property is certainly relevant to showing a market demand for that use. The district court apparently presumed that a general market for a landfill could not exist because much of the proposed landfill site is allegedly abutted by Gold Fields' property. Desert Citizens disputes this determination,[15] and correctly notes that the court's argument is found nowhere in the record.
 
 
 52
 Finally, the district court's determination that a landfill is a high-risk venture does not preclude consideration of such a use in establishing market value, because any attendant risks will be factored into such an evaluation. The district court's presumption cannot be found in BLM regulations, guidelines, the UAS, or other appraisal standards. In general, if a proposed use is reasonable and not merely speculative or conjectural, an element of risk is an insufficient basis upon which to exclude that use from consideration. The case law is replete with examples of highest and best uses for which various contingencies must occur prior to their effectuation. For example, in McCandless v. United States, 298 U.S. 342 (1936), where the Supreme Court determined that cattle ranch lands could be converted to a more profitable use as a sugar plantation, the possibility of obtaining water from outside sources was held to be not so remote and speculative as to preclude from consideration that potential use of the land. See id. at 344-46. Here, the use of the land as a landfill was not only reasonable, it was the specific intent of the exchange that it be used for that purpose. There is no principled reason why the BLM, or any federal agency, should remain willfully blind to the value of federal lands by acting contrary to the most elementary principles of real estate transactions.
 
 
 53
 3. Physical, Legal, and Financial Feasibility
 
 
 54
 The BLM appraisal should have considered the landfill use as a possible highest and best use. Information available at the time of the appraisal made it reasonably probable that the property's potential use as a landfill was physically possible, legally permissible, and financially feasible. See UAS at 8-9.
 
 
 55
 The 1994 draft EIS for the landfill project listed various physical features making the site suitable for a landfill, including: location near a region with a growing need for landfill capacity, rail service, low water table, availability of landfill cover and liner material from the nearby mine, water supply, electricity, highway access, and low earthquake potential. Evidence also indicated at the time of the appraisal that the landfill would be legally permissible. Imperial County's General Plan Environmental Impact Report ("EIR"), issued in October 1993, described the landfill project as a "reasonably foreseeable future project." The EIR determined that the landfill would have no unmitigable, significant adverse affects on agriculture, traffic circulation, sensitive biological resources, cultural resources, air or water quality. The draft EIS described the landfill project as the "preferred action" for the property. These factors indicate that some of the necessary permits and authorizations from the county and federal agencies would be obtained. The appraisal report did not acknowledge these factors, nor did it consider the probability of a zoning change as required by the UAS.[16]
 
 
 56
 A regional market and the presence of competitors sponsoring similar projects made reasonably probable, prior to the 1994 appraisal, that use of the lands for landfill purposes was financially feasible. The draft EIS for the Mesquite Regional Landfill described other proposed landfill projects in the region, including the Eagle Mountain Regional Landfill proposed by Kaiser and the Chocolate Mountain Landfill proposed by Chambers Waste Systems. Both of these projects would be served by the same rail line as the Mesquite Regional Landfill. According to the draft EIS, a 1988 feasibility study by the Southern California Association of Governments listed the selected lands as one of nine potential railhaul regional landfill sites in Southern California. The presence of additional proposals may indicate that there was a general market for landfill sites in Southern California that were remote from urbanized areas but accessible to them by rail.
 
 B. Necessity of Updating the Appraisal
 
 57
 According to BLM guidelines, two kinds of circumstances trigger the need to reconsider an appraisal: a) expiration of the appraisal's shelf life; or b) the occurrence of "significant local events" that may affect the value of the property, including a "significant change in pertinent laws or zoning. " BLM Handbook Manual H-2200-1, Chapter VII(J). The Handbook Manual provides that an appraisal is presumed to be valid for only six months, subject to a decision to extend its validity:
 
 
 58
 Generally, approved values are valid for 6 months but this may vary by state or individual circum stances. . . . Appraisal updates should be requested as the appraisal approaches the end of its shelf life, or if significant local events warrant a re examination. Examples of such events include: known sale of near-by property, announcement of plans in the area for major projects, developments, industrial sitings, etc.
 
 
 59
 Id. BLM's Chief State Appraiser similarly noted in a declaration that when an appraisal reaches the end of its shelf life "a check should be made to determine whether there have been significant changes in the market that would affect the subject property's value." Even under the California State Office's unwritten policy of presuming appraisals to be valid for a year, the Nichols & Gaston appraisal would have expired in June, 1995, eight months before it was used by BLM as the basis for the ROD.[17]
 
 
 60
 A check should have been made, as the shelf life of the appraisal had long expired, and "significant local events" had taken place between the time of the appraisal and the signing of the ROD in 1996. Those events substantially increased the likelihood that landfill use of the selected lands would be probable and permissible. The ROD itself discloses that in September, 1995, fifteen months after the appraisal was prepared and five months before the BLM approved the land exchange, Imperial County approved a General Plan Amendment to facilitate the landfill project. The Amendment included the zoning change of the subject property from "open space" to "heavy manufacturing." The County also signed a development agreement for the landfill project, and issued a conditional use permit to build and operate a landfill at the site. Before the ROD was signed, the BLM had decided to grant the right of way necessary to provide rail access to the landfill site, and California's Regional Water Quality Control Board had issued waste discharge requirements for the project.
 
 
 61
 There is no evidence in the record to indicate that BLM considered whether the new zoning for the selected lands, in combination with the other county and state actions, might warrant re-examination of the appraisal. As noted earlier, the UAS requires reasonably probable zoning changes to be taken into account. Here, the zoning change and related actions already had taken place well before the ROD was signed.
 
 
 62
 The district court's decision was based, in large part, on its assumption that BLM's Acting Chief State Appraiser, David Reynolds, had determined in a June 1995 review appraisal that the valuations would be valid for an additional one-year period unless the market showed significant changes before that time. The court reasoned that no update was needed because Desert Citizens had not demonstrated any significant changes in the market during that period. As Desert Citizens points out, however, the court erred in its reasoning because the record indicates that the June 1995 review by Mr. Reynolds and the additional one-year presumption pertained to the private "offered" lands rather than the selected federal lands that were the subject of the appraisal.[18] Moreover, the "significant local events" contemplated by the BLM guidelines are independent of market fluctuations and include "significant change[s] in pertinent laws or zoning" or other events which may substantially affect the value of a parcel of property. These would include the zoning change and other enactments associated with Imperial County's September 1995 resolution approving the General Plan Amendment.
 
 
 63
 The August 1994 appraisal review by BLM's State Office, which discredited Nichols & Gaston's valuation of the offered lands but approved the valuation of the selected lands, stated that Nichols & Gaston's "[highest and best use] discussion is quite perfunctory and basically unsupported in theory or practice." However, acknowledging the limited scope of the appraisal review process, the document noted that"[a]n appraisal review is an independent critique and evaluation of the appraisal report submitted, not a duplication of the appraisal effort . . . [L]ittle attempt was made [to] independently verify either the market data found or that used in the report."
 
 
 64
 C. Failure of BLM to Value Properly the Land Exchanged.
 
 
 65
 The major discrepancy in this land exchange is the failure of the BLM to value properly the land being acquired by Gold Fields. The Record of Decision signed by the BLM in February 1996 approving the exchange of the 1,745 acres was entitled "Record of Decision: Mesquite Regional Landfill," yet the value of the land as a landfill was never considered. It was clearly intended by both the BLM and Gold Fields that this property would be used as a landfill. Gold Fields had earlier joined with the BLM in applying to Imperial County, California for the appropriate zoning and permits to operate the regional landfill. The BLM and Imperial County had joined in a Final Environmental Impact Statement and Environmental Impact Report for the Proposed Mesquite Regional Landfill in June of 1995. The Record of Decision itself stated "The BLM lands exchanged to Gold Fields Mining Corporation will be used to support the M[esquite] R[egional] L[andfill]." Thus, there is no doubt that the BLM fully knew at that stage that the probable use of the 1,745 acres, which composed 40% of the proposed landfill, was for a regional landfill.
 
 
 66
 We conclude that the exchange must be set aside because neither the Nichols & Gaston appraisal nor the BLM at the time of its Record of Decision considered this landfill use for the property, even though it was clear that it was the intended and most likely use of the parcel.
 
 
 67
 The BLM had before it for comparison an appraisal for tax purposes of a 120-acre landfill site in Imperial County, valuing the property at $46,000 per acre. Although the tax appraisal does not meet all the standards for a BLM appraisal, the difference between $46,000 an acre for a landfill site, and the $350 an acre for open space or mine support, is evidence that the value of the land if appraised for a landfill would be much higher. The government must not wear blinders when it participates in a real estate transaction, particularly if the result, as here, is the transfer of a flagrantly undervalued parcel of federal land to a private party.
 
 
 68
 If the 1,745 acres were valued at $46,000 per acre as the tax appraisal stated, the value of the land transferred to Gold Fields would be $80 million instead of the $610,910 assigned to it by the BLM. Of course, an appraisal of a potential landfill site would be lower than one that is currently operating as a landfill and it would have to evaluate the size, the distance from the population, the likelihood of ultimate approval, and other factors. The point is that this potential use should have been considered in evaluating the highest and best use. At the time of the Record of Decision to transfer the 1,745 acres, Imperial County had approved the landfill and had made all of the zoning and land use decisions necessary to accommodate the project. The action of the BLM was arbitrary and capricious in not, at the very least, considering landfill use as the highest and best use of the 1,745 acres.
 
 V.
 Unwinding the Exchange
 
 69
 BLM and Gold Fields consummated the land exchange the day after the district court dismissed this action, although the parties were fully advised that the transaction could be set aside by later proceedings. BLM and Gold Fields acted at their peril in transferring the land while on notice of the pendency of a suit seeking an injunction against them.
 
 
 70
 In Butz, where the parties rushed to consummate a preFLPMA land exchange two days after the district court granted summary judgment in their favor, we denied defendants' contention that the legality of the transfers was beyond the jurisdiction of this court:
 
 
 71
 [A]fter a defendant has been notified of the pen dency of a suit seeking an injunction against him, even though a temporary injunction be not granted, he acts at his peril and subject to the power of the court to restore the status, wholly irrespective of the merits as they may be ultimately decided . . . .
 
 
 72
 Butz, 485 F.2d at 411 (alteration in original) (quoting Jones v. SEC, 298 U.S. 1, 17 (1936)); see also Porter v. Lee, 328 U.S. 246, 251 (1946) ("It has long been established that where a defendant with notice in an injunction proceeding completes the acts sought to be enjoined the court may by mandatory injunction restore the status quo."); Griffin v. County Sch. Bd., 363 F.2d 206, 210-11 (4th Cir. 1966) (school board held in civil contempt for disbursing money to private school pending appeal of judgment denying injunction against disbursement).
 
 
 73
 This is not a case in which the exchange had been completed substantially prior to the initial challenge before the district court. See Northern Plains, 874 F.2d at 663. Nor would an order declaring void the executed portion of the land exchange destroy the legal entitlements of absent parties, or return federal lands which have been irrevocably changed by private actions. See Kettle Range Conservation Group v. BLM, 150 F.3d 1083, 1087 (9th Cir. 1998). In this case, the necessary parties have been joined and construction of the landfill project has not commenced.
 
 VI.
 Conclusion
 
 74
 Desert Citizens has standing to sue to set aside a land exchange that does not fulfill the statutory and regulatory requirements in establishing the value of the federal lands to be lost to the use of its members. Desert Citizens is not required to speculate as to what the ultimate disposition of the lands will be to establish that the injury will be redressed. The district court's dismissal and its denial of a preliminary injunction are reversed, and the case is remanded for entry of a preliminary injunction setting aside this land exchange pending further proceedings in accordance with this opinion.
 
 
 75
 REVERSED and REMANDED.
 
 
 
 Notes:
 
 
 [1]
 FLPMA Section 206(b) states, in pertinent part:
 The values of the lands exchanged by the Secretary under this Act . . . either shall be equal, or if they are not equal, the values shall be equalized by the payment of money to the grantor or to the Secretary . . . so long as payment does not exceed 25 per cen tum of the total value of the lands or interests transferred out of Federal ownership. The Secretary . . . shall try to reduce the amount of the payment of money to as small an amount as possible.
 43 U.S.C. S 1716(b).
 
 
 [2]
 Desert Citizens had alleged two injuries before the district court. In addition to loss of use of the federal lands at the landfill site, discussed here, Desert Citizens had alleged an injury in the form of reduced acreage of private offered lands in the wilderness areas as a result of an unfair trade. Desert Citizens alleges only the first injury on appeal.
 
 
 [3]
 Use of the selected lands for these purposes is confirmed by the Nichols & Gaston appraisal, which notes that "[r]ecreational activities in the area consist of hiking, sightseeing, rock hounding, nature study, off road vehicle use, camping and photography."
 
 
 [4]
 In addition to preserving domestic sources of food and minerals, see 43 U.S.C. S 1701(a)(12), FLPMA requires "the public lands [to] be managed in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values; that, where appropriate, will preserve and protect certain public lands in their natural condition; that will provide food and habitat for fish and wildlife and domestic animals; and that will provide for outdoor recreation and human occupancy and use." 43 U.S.C. S 1701(a)(8).
 
 
 [5]
 The Supreme Court has reiterated that "where a harm is concrete, though widely shared, the Court has found `injury in fact.' " Federal Election Comm'n v. Akins, 524 U.S. 11, 24 (1998).
 
 
 [6]
 While not discussing the possibility of this outcome in its analysis of standing, the district court acknowledged that this was the relief requested: "[I]f successful on the merits, the relief requested by the Plaintiffs is for this Court to set aside BLM's approval of the land exchange as mandated by the APA."
 
 
 [7]
 In the court's words, "[b]y requiring the Contractors and Western to establish by contract the procedures for review over`any dispute,' and then listing by name the authorized Contractors, Congress fairly discernibly specified who would have standing to challenge ratesetting while enabling the parties themselves to determine the appropriate forum." Overton Power, 73 F.3d at 256.
 
 
 [8]
 Section 206 of FLPMA and its implementing regulations permit the Secretary of the Interior or his designee to dispose of public lands in exchange for non-federal lands only on condition that the public interest will be served by the trade, 43 U.S.C. S 1716(a), and the value of the public lands conveyed away is equal to the value of the non-federal lands to be acquired, taking into account any cash included as part of the exchange, 43 U.S.C. S 1716(b).
 
 
 [9]
 The Uniform Appraisal Standards for Federal Land Acquisitions ("UAS") define fair market value as "the amount . . . for which in all probability the property would be sold by a knowledgeable owner willing but not obligated to sell to a knowledgeable purchaser who desired but is not obligated to buy. In ascertaining that figure, consideration should be given to all matters that might be brought forward and reasonably given substantial weight in bargaining by persons of ordinary prudence . . . ." UAS at 4.
 
 
 [10]
 BLM and UAS definitions of "highest and best use" differ slightly but not dispositively for the purpose of this case. BLM regulations define "highest and best use" as the "most probable legal use of a property, based on market evidence as of the date of valuation, expressed in an appraiser's supported opinion." 43 C.F.R. 2200.0-5(k). Under the UAS, "highest and best use" requires a showing of "reasonable probability." See UAS at 9. Desert Citizens uses the UAS definition, as did the Nichols & Gaston appraisal. BLM uses the regulatory definition in its papers. The choice of standard is not dispositive in this case, because the landfill use was the most probable use of the selected lands at the time the appraisal was made. The essential point of either probability standard is that the highest and best use must not be merely speculative or conjectural. The fact that the landfill use was not considered at all is what makes the appraisal flawed.
 
 
 [11]
 As earlier noted, the consequences of a consideration of landfill use could be substantial. The Nichols & Gaston appraisal valued the land's highest and best use as mine support, a use that renders the land virtually valueless in terms of market value. The market value of the land, if used as a landfill, is certain to be considerably more than this minimal value. This difference in value could alter the calculus of the land exchange tremendously.
 
 
 [12]
 The Supreme Court clarified this in the case cited in Weyerhaeuser as authority for the proposition, United States v. Cors, 337 U.S. 325, 332 (1948). There the Court stated:
 The Court in its construction of the constitutional provision has been careful not to reduce the concept of "just compensation" to a formula. The political ethics reflected in the Fifth Amendment reject confiscation as a measure of justice. But the Amendment does not contain any definite standards of fairness by which the measure of "just compensation" is to be determined. The Court in an endeavor to find working rules that will do substantial jus tice has adopted practical standards, including that of market value. But it has refused to make a fetish even of market value, since that may not be the best measure of value in some cases. At times some elements included in the criterion of market value have in fairness been excluded, as for example where the prop erty has a special value to the owner because of its adaptability to his needs or where it has a special value to the taker because of its peculiar fitness for the taker's project.
 Id. (citations omitted).
 
 
 [13]
 BLM reads Weyerhaeuser too broadly. While seeking payment from the condemnor because of a particular value of the property to the condemnor generally is not allowed, establishing the highest and best use by reference to the condemnor's proposed use generally is permitted. 4 Nichols, Law of Eminent Domain S 12.21 & 12.315 (3d Ed. 1985). See, e.g., City of Los Angeles v. Decker, 18 Cal. 3d 860, 867, 869 (1977) (City of Los Angeles could not claim that there was no demand for airport parking where it had determined to acquire the subject property for that use.).
 
 
 [14]
 A private owner of the 1,745 acres would certainly take into consideration the value of the land to the proposed buyer. No private seller would be willing to transfer his land to Gold Fields for the "open-space" price of $350 an acre knowing that Gold Fields stood to reap substantial profits from the use of the property as a landfill. A private seller would, at the very least, want his property appraised for use as a landfill before selling it.
 
 
 [15]
 Desert Citizens concedes that around 135 acres of public land located in Sections 8 and 17 are surrounded by Gold Fields' private property. However, they contend that portions of the remaining 1,615 acres of selected lands are contiguous to, and accessible from, other BLM lands and therefore could be made available to competing landfill operators. Desert Citizens also notes that Highway 78 provides direct access to portions of the selected lands in Sections 19, 20, and 21.
 
 
 [16]
 In assessing whether a particular use may be legally permissible, the UAS and other authorities require appraisal reports to consider the reasonable probability of zoning changes that would accommodate more valuable uses of the property: "An appraiser has an obligation to consider not only the effect of existing land use regulations, but also the effect of reasonably probable modifications of such land use regulations. This includes the impact on value of the probability of a rezone of the property being appraised . . . ." UAS at 85 (footnote omitted)."When there is a reasonable probability of rezoning, some adjustment must be made to the value of the property as zoned . . . The general rule is that a "reasonable probability" of a zoning change must be shown . . . . " 26 Am. Jur.2d Eminent Domain S 319 (1996) (footnotes omitted).
 Before the appraisal was made, the County identified a landfill as the use for the selected lands. It follows that there was a reasonable probability that a zoning change would occur. The appraisal report failed to account for the likelihood of a zoning change that would accommodate landfill proposals in the area.
 
 
 [17]
 The UAS states that "[w]hen appraisals have been made any substantial period in advance of the date of negotiations for purchase or the filing of a petition requesting right of possession or a complaint or declaration of taking in condemnation proceedings, the appraisals must be carefully reviewed and brought up to date in order to reflect current market conditions." UAS at 87.
 
 
 [18]
 In addition to the review appraisal itself, the declaration of Thomas F. Zale, BLM's El Centro Supervisory Resource Management Specialist, confirms that the subject of Mr. Reynold's June 1995 review was the appraisal of the offered private lands rather than the selected lands.